IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUL - 2 2008
CLERK, U.S. DISTRICT COURT
By _____
Deputy

STATE FARM FIRE & CASUALTY §
COMPANY, §
§
Plaintiff, §
§
VS. § NO. 4:07-CV-013-A
§
BLAKE MIRAGLIA, ET AL., §
§
Defendants. §

MEMORANDUM OPINION
and
ORDER

This diversity action was brought under the Federal

Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiff, State

Farm Fire & Casualty Company, ("State Farm") has filed two

motions for summary judgment. The first sought a declaration

that because of untimeliness of notice given to State Farm of

claims and litigations against its insured, defendant Blake

Miraglia ("Miraglia"), it does not have an obligation under

insurance policies it issued to him as to claims made against him

in liability suits brought in Texas state courts (collectively,

"Texas state court suits") by the other defendants, Tara

Schuchmann ("Schuchmann"), Rick Wessel ("Wessel"), Phillip Powell

("Powell"), and J. Alan Barron ("Barron") (collectively,

"underlying plaintiffs").  The second seeks a declaration that State Farm provides no coverage as to those claims and suits because of the coverage language and certain exclusions in the policies.  Miraglia countered with two motions for summary judgment of his own, collectively seeking summary adjudications that State Farm must defend him in the Texas state court suits and indemnify him for any liability he might suffer in those suits.[1]  The court has concluded that State Farm's motions should be granted and that Miraglia's should be denied.

I.

Nature of the Litigation and
Basic Facts About Which There is no Dispute

State Farm issued two policies of liability insurance to Miraglia, both of which were in effect during the period of time when Miraglia engaged in the conduct about which the underlying plaintiffs complain in the Texas state court suits.  One was a homeowners policy, bearing policy number 81-KW-0884-8, and the other was an umbrella policy, bearing policy number 81-K8-9032-5. Both named Miraglia and his wife as insureds.  The controversy is

---

[1]Miraglia has filed exceptions and objections to some of State Farm's summary judgment evidence and presentations.  The court is not issuing orders in response thereto, but is giving the items to which exception or objection is made only such weight as they legally deserve in these summary judgment proceedings.

over whether State Farm has defense and payment obligations under either or both of these policies with respect to the Texas state court suits and the claims being asserted therein by the underlying plaintiffs.

The underlying plaintiffs seek recovery for damages in the Texas state court suits that they allege were caused by defamatory information Miraglia posted on the Yahoo Finance Message Boards under the pseudonym "paydaylender" after disputes developed between Miraglia and First Cash Financial Services Inc. ("First Cash") over business arrangements they had entered into as part of First Cash's acquisition of Miraglia, Inc., a business that was owned by Miraglia.

The disputes between First Cash and Miraglia led to a suit by Miraglia against First Cash in the District Court of Tarrant County, Texas, 48th Judicial District (No. 48-195989-2), seeking a recovery for damages based on alleged breaches of duty owed by First Cash to Miraglia arising out of their business arrangements. In August 2003 First Cash filed a counterclaim against Miraglia in suit No. 48-195989-2 in which it made the

following allegations in support of its request for recovery for damages from Miraglia:

9.   On October 4, 2002, Miraglia resigned his employment from First Cash amid certain controversies and disputes, and this lawsuit followed soon thereafter.  Disgruntled and with an axe to grind, Miraglia resorted to a cyber smear campaign against FCFS.

10.   Miraglia used as his forum the Yahoo Finance Message Boards where he posted under the pseudonym "paydaylender."  There, cloaked with anonymity and unencumbered by editorial filters, Miraglia shared information, including false and misleading information, about First Cash with the world.  At times, Miraglia even wrote about himself in the third person for the purpose of further misleading and deceiving the recipients.

11.   Motivated by bitterness and ill will, Miraglia made numerous false assertions of management insider trading, management's disregard for shareholder rights and fiduciary duties, improper compensation schemes between the board and management, and failure of First Cash to disclose material information.

12.   Among the themes revisited and false statements repeated by Miraglia were allegations that corporate insiders, board members and members of the management team, had engaged in the illegal practice of insider trading.  For example only, and not by limitation, in one message entitled "Insiders Dumping Again," Miraglia suggested that management "created . . . positive news so they could sell into it."  He also suggested that First Cash was withholding material and adverse information from the market, while [corporate insiders] dump shares."  In addition, Miraglia accused First Cash's management of engaging in an illegal "pump and dump" scheme.

13.   Miraglia liberally used innuendo and/or implication in his publication of false and malicious statements regarding FCFS, and its management.   The information conveyed by Miraglia created a false impression of FCFS' business as well as the character of its management.

14.   That Miraglia was bent on harming FCFS is evident from another message in which Miraglia wrote, "Their actions have pushed me to take actions which are irreversible."   Clearly, Miraglia was on a mission to injure FCFS, albeit a pathetic and misguided one.   He understood and intended the damaging consequences of his actions.

15.   The consequences of Miragla's [sic] actions are far reaching.   Not only did he impeach the honesty, integrity, virtue and reputation of First Cash, he falsely accused First Cash with  the commission of a crime.   As a result, First Cash has suffered or incurred injuries to its character, good will and reputation, as well as economic harm.

State Farm's Resp. to Miraglia's First Mot. for Summ. J., App. Vol. 1 at 259-61.   A copy of the counterclaim was served on Miraglia, through his counsel, in August 2003.

Virtually identical allegations were made in a series of suits filed against Miraglia in August 2003 by officials of First Cash who alleged that they were damaged by Miraglia's internet postings.   One was filed in the Superior Court of the State of Arizona, in and for the County of Maricopa, ("Arizona state court

suit") by Richard T. Burke ("Burke"), a member of the board of directors of First Cash. Miraglia's allegations against the officials of First Cash were modified as necessary to reflect the claims of the officials that Miraglia acted intentionally, knowingly, and with malice to harm them when he made his internet postings. For example, Burke alleged in the Arizona state court suit that:

> 6.   . . . Miraglia became a cyber-libelist, embarking on a cyber smear campaign against FCFS and its officers and directors, including Burke.

> . . . .

> 8.   Consumed by bitterness and ill will, Miraglia knowingly and with malice made numerous false assertions of insider trading, disregard for shareholder rights and fiduciary duties, improper compensations schemes between the board and management, and failures to disclose material information.

> . . . .

> 12.   That Miraglia was bent on harming Burke, FCFS and the shareholders of FCFS is evident from another message in which Miraglia wrote, "Their actions have pushed me to take actions which are irreversible." Clearly, Miraglia was on a perceived "mission" to injure Burke, FCFS, and the shareholders of FCFS, albeit a pathetic and misguided one. He understood and intended the damaging consequences of his actions.

Id. at 272-73. Miraglia was served with Burke's complaint in August 2003.

On the date of the filing of Burke's pleading in Arizona, Joe R. Love ("Love") filed a pleading instituting an action against Miraglia in the District Court in and for Oklahoma County, State of Oklahoma ("Oklahoma state court suit"). Love alleged that he is a member of the board of directors of First Cash. He made allegations against Miraglia virtually identical to the allegations Burke made in his Arizona state court suit. Miraglia was served with a copy of Love's suit papers in August 2003.

The underlying plaintiffs filed their Texas state court suits against Miraglia in the last half of the year 2003. Id., Vol. 2 at 367-68.[2] Barron's was filed in the 415th District Court of Parker County, Texas, in August 2003 as Case No. 51257; Powell's was filed in the 236th District Court of Tarrant County, Texas, in December 2003 as Case No. 236-203613-03; Wessel's was filed in the 48th District Court of Tarrant County, Texas, in December 2003 as Case No. 48-203617-03; and Schuchmann's was filed in the 134th District Court of Dallas County, Texas, in December 2003 as Case No. 03-13611-G. Id. Barron alleged that

---

[2]Apparently Miraglia maintains that he was not aware of the filing of the Texas state court suits until he was served with process in those suits in May 2004.

he was Chief Operations Officer of First Cash; Powell alleged that he was Chief Executive Officer and Chairman of the Board of First Cash; Wessel alleged that he was President, Secretary, Treasurer, and member of the board of directors of First Cash; and Schuchmann alleged that she was a member of the board of directors of First Cash. The court infers that each of the underlying plaintiffs made allegations against Miraglia that were basically the same as the allegations Burke and Love made against him in the August 2003 Arizona and Oklahoma state court suits.

The underlying plaintiffs appear to have withheld service of process on Miraglia as to the Texas state court suits for several months. In the interim, Miraglia, First Cash, Burke, and Love engaged in negotiations and reached a settlement of (a) the claims Miraglia made in his litigation against First Cash (No. 48-195989-2); (b) First Cash's counterclaim against Miraglia in that suit; and (c) the claims made against Miraglia in the Arizona and Oklahoma state court suits. That settlement led to the dismissals of those three suits. Miraglia attempted unsuccessfully in September 2003, as part of the overall settlement negotiations, to obtain releases from each individual

officer and director of First Cash, including, of course, the underlying plaintiffs. Id., Vol. 1 at 291-92.

In April 2004, each of the underlying plaintiffs filed a first amended original petition in his or her Texas state court suit. The allegations made in each basically were the same as those made in the others and the allegations made against Miraglia in First Cash's counterclaim in suit No. 48-195989-2 and in the Arizona and Oklahoma state court suits. Process was served on Miraglia in early May 2004 as to each of the amended petitions filed by the underlying plaintiffs in their respective state court actions.

By letter to State Farm on March 8, 2005, an attorney acting on behalf of Miraglia, Byron R. Gerstel ("Gerstel"), requested that State Farm assume Miraglia's defense in the Texas state court suits and indemnify Miraglia from the claims made against him in the suits. Before the March 8, 2005, letter was sent to State Farm, neither Miraglia nor anyone acting on his behalf had (a) notified State Farm of the claims made against Miraglia by First Cash in the counterclaim it filed in suit No. 48-195989-2 or the claims made against Miraglia in the Arizona and Oklahoma state court suits, or (b) sent to State Farm the original or a copy of any of the pleadings, notices, summonses, or other

process Miraglia had received in connection with any of the litigation against him that has been mentioned above. By a letter dated April 14, 2005, State Farm agreed to defend Miraglia in the Texas state court suits subject to non-waiver-of-rights agreements.

The instant declaratory judgment action was filed January 4, 2007, seeking declarations that State Farm does not have defense or payment obligations as to the Texas state court suits under either of the insurance policies it issued to Miraglia. State Farm's current pleading is its Second Amended Complaint for Declaratory Judgment.

II.

The Motions for Summary Judgment

Initially State Farm and Miraglia each filed a motion for summary judgment asking for a summary adjudication on the issue of whether timely notice was given by Miraglia to State Farm, without addressing other coverage questions. By order signed April 3, 2008, the court expressed concern about devoting judicial resources to a resolution of the notice issue unless all coverage issues were to be addressed at the same time. Each side then filed a second motion for summary judgment, addressing other coverage issues.

III.

Analysis

A.  <u>Summary Judgment Standards</u>.

A party is entitled to summary judgment on all or any part
of a claim as to which there is no genuine issue of material fact
and as to which the moving party is entitled to judgment as a
matter of law.  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby,
Inc.</u>, 477 U.S. 242, 247 (1986).  The moving party has the initial
burden of showing that there is no genuine issue of material
fact.  <u>Anderson</u>, 477 U.S. at 256.  The movant may discharge this
burden by pointing out the absence of evidence to support one or
more essential elements of the non-moving party's claim "since a
complete failure of proof concerning an essential element of the
nonmoving party's case necessarily renders all other facts
immaterial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-25
(1986).  Once the moving party has carried its burden under Rule
56(c), the non-moving party must do more than merely show that
there is some metaphysical doubt as to the material facts.
<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S.
574, 586 (1986).  The party opposing the motion may not rest on
mere allegations or denials of pleading, but must set forth
specific facts showing a genuine issue for trial.  <u>Anderson</u>, 477

11

U.S. at 248, 256. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994). An issue is material only if its resolution could affect the outcome of the action. Anderson, 477 U.S. at 248. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. Simmons v. Lyons, 746 F.2d 265, 269 (5th Cir. 1984).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law. Celotex Corp., 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita, 475 U.S. at 597. See also Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc) (explaining the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict).

B.  There is an Actual Controversy in the Sense
    Contemplated by the Federal Declaratory Judgment Act
    Between State Farm and the Underlying Plaintiffs.

In reliance on decisions of Texas state appellate courts,

the underlying plaintiffs open their argument in response to

State Farm's second motion for summary judgment by asserting that

there is no actual controversy between them and State Farm, and

will not be unless and until they obtain a judgment against

Miraglia in the underlying state court suits.[3]  From that

premise, the underlying plaintiffs reason that a declaratory

judgment cannot be rendered against them in favor of State Farm.

The court disagrees.

The basic fallacy in the argument of the underlying

plaintiffs is their apparent belief that decisions interpreting

the Texas Declaratory Judgment Act govern even though this action

was brought under the Federal Declaratory Judgment Act.  "Federal

standards, however, govern federal courts' determination of the

propriety of declaratory relief under the Declaratory Judgment

Act."  Icarom, PLC v. Howard County, Md., 904 F. Supp. 454, 458

_____

[3]Miraglia concedes the existence of an "actual controversy."
Miraglia's Mem. in Supp. of Resp. to State Farm's Second Mot. for
Summ. J. at 6.  In American States Insurance Co. v. Bailey, 133 F.3d
363, 368 (5th Cir. 1998), the Fifth Circuit held that under the
Federal Declaratory Judgment Act an "actual controversy" exists in a
case such as this.

(D. Md. 1995).  See also American States Ins. Co. v. Bailey, 133
F.3d 363, 368 (5th Cir. 1998); Western Heritage Ins. Co. v. River
Entm't, 998 F.2d 311, 315 (5th Cir. 1993); Cincinnati Ins. Co. v.
Holbrook, 867 F.2d 1330, 1332-33 (11th Cir. 1989); Ohio Cas. Ins.
Co. v. Cooper Mach. Corp., 817 F. Supp. 45, 47 n.1 (N.D. Tex.
1993); State Farm Mut. Auto. Ins. Co. v. Bates, 542 F. Supp. 807,
817 (N.D. Ga. 1982).

     In Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S.
270 (1941), the Supreme Court held that an actual controversy
existed in the context of the Federal Declaratory Judgment Act
between an insurance company and the plaintiff in an underlying
state court suit brought against the insured.  Id. at 274.
Maryland Casualty Co. provided liability insurance coverage to
Pacific Coal & Oil Co.  Orteca brought a tort action in an Ohio
state court against Pacific to recover damages resulting from
injuries sustained in an automobile collision.  Before the tort
action had proceeded to judgment, Maryland brought a federal
declaratory judgment action against Pacific and Orteca asking for
an adjudication that it was not obligated to defend the action
brought by Orteca against Pacific or to indemnify Pacific if
Orteca prevailed.  In the course of rejecting Orteca's contention

that there was not an actual controversy between the insurer and

Orteca, the Supreme Court explained:

> It is clear that there is an actual controversy
> between petitioner and the insured. If we held
> contrariwise as to Orteca because, as to him, the
> controversy were yet too remote, it is possible that
> opposite interpretations of the policy might be
> announced by the federal and state courts. For the
> federal court, in a judgment not binding on Orteca,
> might determine that petitioner was not obligated under
> the policy, while the state court, in a supplemental
> proceeding by Orteca against petitioner, might conclude
> otherwise.

> Thus we hold that there is an actual controversy
> between petitioner and Orteca, and hence, that
> petitioner's complaint states a cause of action against
> the latter.

Id. (citations omitted).

Moreover, the response of the underlying plaintiffs

factually belies their argument that there is no actual

controversy.  They vigorously take issue with State Farm's

contentions in this declaratory judgment action that State Farm

does not have a duty to defend Miraglia in the Texas state court

suits and will not have a payment obligation to Miraglia or the

underlying plaintiffs as to the causes of action asserted by the

underlying plaintiffs in those suits.  Moreover, the policies

have language that causes the underlying plaintiffs to be

potential beneficiaries under the policies.[4]  Therefore, the underlying plaintiffs are incorrect as a matter of legal principle and actual fact in their assertions that there is no actual controversy between them and State Farm.

C.    The Homeowners Policy.

The potentially pertinent part of the homeowners policy is Section II, which provides liability insurance coverage.  The part of the clause that describes in a general way the liability insurance provided by the policy reads as follows:

> If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** . . . to which this coverage applies, caused by an **occurrence**, we will:
>
> 1.    pay up to our limit of liability for the damages for which the **insured** is legally liable; and
>
> 2.    provide a defense at our expense by counsel of our choice. . . .

Second Am. Compl., App. at 019.

---

[4]The homeowners policy contemplates that a claimant against Miraglia can bring an action against State Farm once Miraglia's obligation to the claimant has been determined by final judgment. Second Am. Compl., App. at 023.  Under the heading "Payment of Loss," the umbrella policy provides that, after State Farm's payment obligation has been set by final judgment, it "will pay the claimant directly" if Miraglia wishes.  Id. at 043.

The words "bodily injury" and "occurrence" are given a special meaning in the policy. The term "bodily injury" is defined in pertinent part as follows:

> 1. **"bodily injury"** means physical injury, sickness, or disease to a person. . . .

Id. at 005. The policy excludes from the term "bodily injury" the following:

> **Bodily injury** does not include:
>
> . . . .
>
> c. emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury unless it arises out of actual physical injury to some person.

Id. The word "occurrence" is defined, in potentially pertinent part, as follows:

> 7. **"occurrence"**, when used in Section II of this policy, means an accident, . . ., which results in:
>
> a. **bodily injury**; . . . .

Id. at 006.

No plausible argument can be made that any of the claims asserted in the Texas state court suits are covered by the liability insurance provided by the homeowners policy:

> (1) The insuring clause of the policy obligates the insurance company to make payment and provide a defense only if a

claim is made or a suit is brought for damages because of "bodily injury" to which the insurance applies caused by an "occurrence." None of the claims grows out of an "occurrence," which the policy defines to mean an "accident" that resulted in "bodily injury." There being no occurrence (accident) claimed by the underlying plaintiffs, there would appear to be no coverage related to the underlying suits.

(2) "Bodily injury" is not alleged in any of the underlying suits. The allegations indicate that the harms the underlying plaintiffs suffered did not arise out of "physical injury, sickness, or disease to a person." Id. at 005.

Apparently none of the defendants urges at this time that State Farm has a defense or payment obligation under the homeowners policy as to the claims made in the Texas state court suits. In any event, summary judgment for State Farm is appropriate as to those claims.

D.    The Umbrella Policy.

1.    The Potentially Pertinent Policy Language.

The insuring clause of the umbrella policy reads in pertinent part as follows:

> 1.    **Coverage L - Personal Liability**. If you are
>        legally obligated to pay damages for a **loss**, we

will pay your **net loss** minus the **retained limit**. . . .

2. **Defense and Settlement**.

    a. We may investigate, negotiate and settle a claim or suit covered by this policy.

    b. When the claim or suit is covered by this policy, but not covered by any other policy available to you:

        (1) we will defend the suit against you;

Second Am. Compl., App. at 039.

The word "loss," as used in the coverage language quoted above, is defined, in potentially pertinent part, in the Policy Endorsement as follows:

**"loss"** means:

    a. an accident, including injurious exposure to conditions, which results in **bodily injury** . . . during the policy period. . . . ; or

    b. the commission of an offense, or series of similar or related offenses, which result in **personal injury** during the policy period.

Id. at 046.

19

The term "bodily injury" is defined in the Policy

Endorsement as follows:

> **"bodily injury"** means physical injury, sickness,
> disease, emotional distress or mental injury to a
> person. . . .

Id. The term "personal injury" is defined, in potentially

pertinent part, in the Policy Endorsement to mean:

> **"personal injury"** means injury caused by one or more of
> the following offenses:
>
> . . . .
>
> b.   libel, slander, defamation of character or
>      invasion of rights of privacy.

Id. at 047.

The umbrella policy excludes from coverage, with certain

exceptions not applicable here, insurance "for any loss caused by

[Miraglia's] business pursuits." Id. The word "business" is

defined in the policy to mean "a trade, profession or

occupation." Id. at 037. The policy also excludes coverage:

> for **bodily injury** . . .
>
> a.   which is either expected or intended by
>      [Miraglia]; or
>
> b.   to any person . . . which is the result of
>      [Miraglia's] willful and malicious act, no matter
>      at whom the act was directed.

<u>Id.</u> at 047.  Also, the policy excludes coverage "for **personal injury** when [Miraglia] act[s] with specific intent to cause harm or injury."  <u>Id.</u>

The policy's notice and delivery of suit paper requirements read as follows:

> These are things you must do for us.  We may not provide coverage if you refuse to:
>
> 1.  notify us of an accident.  If something happens that might involve this policy, you must let us know promptly.  Send written notice to us or our agent.  Include the names and addresses of the injured and witnesses.  Also include the time, place and account of the accident.
>
> 2.  notify us of a claim or suit.  If a claim or suit is filed against you notify your underlying insurer and us right away.  You must send us every demand, notice, summons or other process you receive.

<u>Id.</u> at 042.

The policy provision that makes compliance with those requirements conditions precedent to enforcement of State Farm's policy obligations reads:

> 4.  **Suit Against Us**.  No action shall be brought against us unless you have complied with policy provisions.

<u>Id.</u> at 043.

2.  The Late Notice Issue.

Now that the court has presentations from the parties on all coverage issues, the court is comfortable that the court has enough of the coverage issue context to make an informed ruling on the late notice coverage issue as to the umbrella policy.  For the reasons given below, the court concludes that the summary judgment record establishes as a matter of law that Miraglia failed to comply with the notice and delivery of suit paper requirements of the umbrella policy, and that, therefore, State Farm has no payment or defense obligation under the policy.

In deciding the late notice issue, the court assumes, arguendo, that coverage would have potentially existed under the policy if timely notice had been given by Miraglia.  Inasmuch as the "bodily injury" feature of the coverage under the umbrella policy so obviously is inapplicable to the claims made in the Texas state court suits for the reasons stated at pages 54-55 of this memorandum opinion, the court focuses on the "personal injury" feature of the policy.

a.  Applicable Substantive Law.

By a memorandum opinion and order the court signed in the instant action on January 30, 2008, the court expressed the conclusion that the substantive law of the State of Georgia

22

should apply to insurance policy interpretation and application
issues in this case, and ordered, specifically, that Georgia law
shall apply to the late notice issue.  The conclusions the court
has reached in the instant memorandum opinion take into account
pertinent Georgia court decisions.

Georgia appellate courts often have discussed the purpose of
notice provisions contained in insurance policies.  In Caldwell
v. State Farm Fire & Casualty Co., 385 S.E.2d 97 (Ga. Ct. App.
1989), the court explained that:

> The purpose of the notice provision . . . is to enable
> an insurer to investigate promptly the facts
> surrounding the occurrence while they are still fresh
> and the witnesses are still available, to prepare for a
> defense of the action, and, in a proper case, to
> determine the feasibility of settlement of the claim.

Id. at 99 (quotation marks omitted) (citing Richmond v. Ga. Farm
Bureau Mut. Ins. Co., 231 S.E.2d 245 (Ga. Ct. App. 1976)).  See
also Plantation Pipeline Co. v. Royal Indem. Co., 537 S.E.2d 165,
169 (Ga. Ct. App. 2000); Southeastern Express Sys., Inc. v.
Southern Guar. Ins. Co. of Ga., 482 S.E.2d 433, 436 (Ga. Ct. App.
1997) (saying that "[t]imely notice and delivery of suit papers
are critical to the contract because it bears upon the insured's
risk and the insurer's ability to investigate, prepare to defend,
or seek to reduce potential liability by settlement.");

Bituminous Cas. Corp. v. J. B. Forrest & Sons, Inc., 209 S.E.2d
6, 8 (Ga. Ct. App. 1974).

The Georgia courts hold that there is no requirement that
the insurance company show that it was prejudiced in order to
avail itself of a late notice defense to a claim of insurance
coverage, apparently on the premise that prejudice to the
insurance company is deemed to follow as a matter of law from
untimely notice.  See Southeastern Express, 482 S.E.2d at 436;
Caldwell, 385 S.E.2d at 99; Richmond, 231 S.E.2d at 249-50;
Bituminous Cas., 209 S.E.2d at 10.

The notice and delivery of suit papers requirements, such as
those contained in the umbrella policy issued by State Farm to
Miraglia, are conditions precedent, the violation of which
relieves the insurance company of any obligations under the
insurance policy.  See Southeastern Express, 482 S.E.2d at 436-
37; KHD Deutz of Am. Corp. v. Utica Mut. Ins. Co., Inc., 469
S.E.2d 336, 338 (Ga. Ct. App. 1996); Bituminous Cas., 209 S.E.2d
at 9.  When the insured fails to comply with the policy
requirements for notice and delivery of suit papers, the
insurance company is relieved of any obligation it otherwise
would have had under the policy to defend or indemnify the

insured.  See Plantation Pipeline, 537 S.E.2d at 169; Richmond,

231 S.E.2d at 250.

While the timeliness of notification and delivery of suit

papers pursuant to obligations imposed under an insurance policy

can be an issue of fact, timeliness often is an issue of law that

can be resolved in favor of the insurance company at the summary

judgment stage.  See Allstate Ins. Co. v. Walker, 562 S.E.2d 267,

268-69 (Ga. Ct. App. 2002) (a delay of approximately eleven

months was untimely as a matter of law); Southeastern Express,

482 S.E.2d at 436-37 (eight months untimely as a matter of law);

KHD Deutz, 469 S.E.2d at 338-39 (seventeen months untimely as a

matter of law); Caldwell, 385 S.E.2d at 99-100 (six months after

service of suit papers and nine to ten months after knowledge of

the event untimely as a matter of law); Snow v. Atlanta Int'l

Ins. Co., 354 S.E.2d 644 (Ga. Ct. App. 1987) (ten months after

accident and six months after suit filed untimely as a matter of

law); Protective Ins. Co. v. Johnson, 352 S.E.2d 760, 761 (Ga.

Ct. App. 1987) (seventeen months untimely as a matter of law);

Richmond, 231 S.E.2d at 249 (eight months untimely as a matter of

law); Bituminous Cas., 209 S.E.2d at 8-9 (four months untimely as

a matter of law); Edwards v. Fid. & Cas. Co. of N.Y., 199 S.E.2d

570, 571 (Ga. Ct. App. 1973) (five months untimely as a matter of law).[5]

The insured is not relieved of his obligation to comply with the policy conditions by reason of his ignorance of the terms of the policy or misplaced confidence. See Allstate, 562 S.E.2d at 268; Protective Ins. Co., 352 S.E.2d at 761. Instead, the insured is charged with knowledge of the policy conditions. See Richmond, 231 S.E.2d at 250. Nor is a belief on the part of the insured that he is free from fault an excuse for not complying with the policy provisions. See Plantation Pipeline, 537 S.E.2d at 169.

_____

[5]The notification requirement in Allstate was that the notice be given "as soon as possible." Allstate Ins. Co. v. Walker, 562 S.E.2d 267, 267 (Ga. Ct. App. 2002). In the remaining cases in which the language of the notice requirement was set forth in the opinion, the notice requirement was "as soon as practicable." Park Pride Atlanta, Inc. v. City of Atlanta, 541 S.E.2d 687, 691 (Ga. Ct. App. 2000); Southeastern Express Sys., Inc. v. Southern Guar. Ins. Co. of Ga., 482 S.E.2d 433, 437 (Ga. Ct. App. 1997); Caldwell v. State Farm Fire & Cas. Co., 385 S.E.2d 97, 98 (Ga. Ct. App. 1989); Snow v. Atlanta Int'l Ins. Co., 354 S.E.2d 644, 645 (Ga. Ct. App. 1987); Protective Ins. Co. v. Johnson, 352 S.E.2d 760, 761 (Ga. Ct. App. 1987); Richmond v. Ga. Farm Bureau Mut. Ins. Co., 231 S.E.2d 245, 249 (Ga. Ct. App. 1976); Bituminous Cas. Corp. v. J. B. Forrest & Sons, Inc., 209 S.E.2d 6, 8 (Ga. Ct. App. 1974); Edwards v. Fid. & Cas. Co. of N.Y., 199 S.E.2d 570, 571 (Ga. Ct. App. 1973). The notification and suit delivery requirements in the umbrella policy ("promptly" and "right away") convey at least as great a sense of urgency as the notification language dealt with by the Georgia courts. Indeed, in Park Pride, the Georgia court equated "as soon as practicable" with "prompt." Park Pride, 641 S.E.2d at 692.

b. Analysis that Assumes, *Arguendo*, that Miraglia Gave Notice to State Farm in May 2004.

The policy notification provision--"things you must do for us," <u>supra</u> at 21--contains important requirements that were calculated to enable the insurance company to become involved at an early stage in activities related to investigation and possible resolution of claims and lawsuits that might be within the coverage of the policy.[6]  In this instance, the important requirements are that:

(a)  "If something happens that might involve this policy, you must let us know promptly."  <u>Id.</u>

(b)  "If a claim or suit is filed against you notify . . . us right away.  You must send us every demand, notice, summons or other process you receive."  <u>Id.</u>

---

[6]In their summary judgment briefs the parties spar over the effect, if any, that might be given to the use of the word "refuse" in the policy's notification provisions.  <u>Supra</u> at 21.  The court has concluded that the use of that word in the policy has no relevance to the issues the court is to decide.  The policy description of the things the insured "must do" includes, in sentences that are independent of the "refuse" clause, clearly stated notification and delivery of suit papers requirements that the court concludes as a matter of law were violated by Miraglia.  While the use of the word "refuse" in the insurance policy is unusual, it does not diminish the direct, and clearly stated, requirements contained in the complete sentences in paragraphs 1 and 2 of the "things you must do for us" notification provisions.

Miraglia knew no later than August 2003, when First Cash filed its counterclaim against him in suit No. 48-195989-2 and when he was served with suit papers in the Arizona and Oklahoma state court suits, that something had happened that might involve the umbrella policy--claims that he had defamed someone. Not only was Miraglia obligated to notify State Farm no later than August 2003 that something happened that might involve the umbrella policy,[7] he was obligated to notify State Farm right away once he learned in August 2003 that defamation claims and suits had been filed against him; and, he was obligated to send State Farm every demand, notice, summons, or other process he received in August 2003.

Miraglia failed to comply with any of these "must do" obligations. He contends that he gave telephone notification to a State Farm sales agent of the Texas state court suits in May 2004, shortly after he was served with process in those suits.[8]

---

[7]State Farm calls the court's attention to facts that would provide basis for a strong argument that Miraglia knew in the spring and early summer of 2003 that he was engaging in conduct, and had engaged in conduct, that might involve the umbrella policy. See State Farm's Br. in Resp. to Miraglia's First Mot. for Summ. J. at 1-2. However, the court does not need to go back that far to reach the conclusion that, as a matter of law, State Farm has established that it did not receive timely notice.

[8]The record raises serious credibility concerns relative to
(continued...)

Assuming that to be true, nevertheless as a matter of law notice given by Miraglia to State Farm in May 2004 was not timely.

Giving Miraglia the benefit of a May 2004 notice date, his notice to State Farm was not given for at least eight months after Miraglia knew that litigation was filed against him in which claims were made on the basis of happenings that "might involve [the] policy." As a matter of law a delay of eight months does not constitute informing State Farm "promptly." Similarly, Miraglia did not notify State Farm of the August 2003 counterclaim of First Cash or the Arizona and Oklahoma state court suits until sometime after May 2004. Thus, he failed as a matter of law to notify State Farm "right away" of claims and suits filed against him in August 2003 that had the potential to involve the umbrella policy. Nor did Miraglia timely send to State Farm the process and other papers he received in connection with the First Cash, Burke, and Love litigation initiated against him in August 2003.

---

[8](...continued)
Miraglia's claim that he gave telephone notice to a State Farm agent in May 2004. The court will return to that issue at a later point in this memorandum opinion. <u>Infra</u> at 32-50. However, at this point the court assumes, for the sake of discussion, that Miraglia called a State Farm agent about the pendency of the Texas state court suits in May 2004.

Had State Farm been timely notified that something had
happened that might involve the umbrella policy and that
defamation claims and suits had been filed against Miraglia in
August 2003, State Farm would have been in a position to join
Miraglia in an attempt to resolve the claims that are being
asserted against him in the Texas state court suits at a time
when negotiations for an overall settlement were underway.  The
record establishes that Miraglia was sensitive during the
settlement negotiations to the possibility that the underlying
plaintiffs would be making defamation claims against him based on
his internet postings, as evidenced by a communication from First
Cash's attorney to Miraglia's attorney on September 30, 2003,
reading, in pertinent part, as follows:

> Since the mediation, you have expressed among other
> things, that . . . (3) Blake wants a release from all
> officers and directors of First Cash; (4) Blake wants a
> broader release than that to which the parties agreed;
> (5) Blake now wants his friends and family released
> . . .
>
> You and Blake postured a great deal at the mediation,
> claiming that you didn't care about the claims of Burke
> and Love.  Predictably, the dismissal of those claims
> was the last condition you placed on the settlement.
> Now, even though you've refused to acknowledge that the
> other former shareholders aren't owed anything, you

want to obtain a release from each individual officer
and director of First Cash -- it's not going to happen.

State Farm's Resp. to Miraglia's First Mot. for Summ. J., App.

Vol. 1 at 291-92 (emphasis added).

No one can say now exactly what State Farm would have been

able to do by way of negotiation or otherwise had it known in

September 2003 that defamation claims were pending against

Miraglia and that others were imminent.  The point is that

Miraglia's failure to comply with the duties imposed on him by

the policy deprived State Farm of an opportunity to be involved

at any early date and to make decisions, and take actions, at

that time based on the then-developing circumstances.  Presumably

had State Farm been given notice, it would have participated in

the defense of Miraglia in the counterclaim of First Cash and the

Arizona and Oklahoma state court suits of Burke and Love,

respectively, in and after August 2003 even though there might

have been an issue as to whether coverage was provided by the

umbrella policy, just as State Farm did in the Texas state court

suits once it received Gerstel's May 8, 2005, letter requesting

State Farm to undertake the defense of those suits.

Miraglia admitted in his deposition that he and his

attorney, acting by themselves, "dropped the ball" and missed an

opportunity to conclude a settlement of all the defamation claims against him, including those that are being asserted in the Texas state court suits. State Farm's Resp. to Miraglia's First Mot. for Summ. J., App. Vol. 1 at 93-94. Had State Farm been timely notified of the August 2003 litigation and defamation claims against Miraglia they would have been afforded an opportunity to take, or assist in the taking, of steps that could have prevented the loss of the opportunity to "wrap it up on September 10, 2003," as Miraglia said he thought had happened. Id. at 94.

Under Georgia law, State Farm is not required to show that it was prejudiced before being relieved of its obligations under the umbrella policy when, as in this case, the insured fails to comply with his notification obligations. However, in this action the court concludes that, even though it was not required to make such a showing, State Farm has shown as a matter of law that it suffered prejudice by reason of Miraglia's failure to comply with his notice and delivery of suit paper obligations.

    c. <u>Analysis that Assumes that Gerstel's March 8, 2005, Letter was Miraglia's First Notice to State Farm</u>.

Thus far the court has given Miraglia the benefit of his belated contention that he told a State Farm agent by telephone in May 2004 about the Texas state court suits shortly after he

was served with process in those suits. The court does not believe that a reasonable finder of fact under the record in this case would accept Miraglia's assertion that he made such a telephone call. The court is inclined to think that any reasonable finder of fact would conclude that the first notice Miraglia or anyone acting on his behalf gave State Farm of the existence of any of the defamation claims against Miraglia or the Texas state court suits was in the form of the letter of Gerstel to State Farm on March 8, 2005. Supra at 9.

Certain of the statements made by Gerstel in his letter, and the letter's silence on other things, are revealing:

> This letter is my client's notification to State Farm Insurance of four suits filed against him, all alleging defamation of character and seeking damages that include mental anguish and mental suffering and Demand for a Defense to and Indemnification from each of these suits.
>
> . . . .
>
> My client did not tender the defense of these actions to you previously inasmuch as he was never advised or understood that coverage was available to him by virtue of these policies. Now that the undersigned has commenced to represent Mr. Miraglia, we have advised him that the policies of insurance that you have issued entitle him to defense and indemnity to the extent of the limits of the policy. He has, to date, defended himself in these actions and has employed counsel at his expense to do so. This request and demand for defense and indemnity does not include a request for reimbursement of those prior expenses at this time; instead it requests your immediate action to

provide Mr. Miraglia with counsel to defend each and every
action. . . .

State Farm's Resp. to Miraglia's First Mot. for Summ. J., App.
Vol. 2 at 435-36.

The court notes that no mention is made in that letter of
any notification given by or on behalf of Miraglia to State Farm
before the writing of the letter. To the contrary, the letter
informed State Farm that Miraglia "did not tender the defense of
these actions to you previously." Also telling is Gerstel's
statement that Miraglia "was never advised or understood that
coverage was available to him by virtue of these policies."
Certainly something different would have been said if, in fact, a
State Farm representative had affirmatively represented to
Miraglia that coverage was not available to him under the
policies. Also of interest is the failure of Gerstel to make any
request or demand on behalf of Miraglia for reimbursement of
expenses Miraglia had incurred up to the date of the writing of
the letter in the defense of the Texas state court suits. Only
an extremely naive person would believe that Gerstel, if he
honestly thought Miraglia had insurance coverage, would not be
"on the warpath" on behalf of Miraglia in the March 8, 2005,
letter if, in fact, Miraglia had contacted State Farm shortly

after he was served with papers in the Texas state court suits in May 2004 and had been informed by State Farm at that time that there was no coverage under the umbrella policy for the defamation claims against Miraglia.[9]

A recorded statement a representative of State Farm took from Miraglia by telephone on June 9, 2006, provides confirmation that, in fact, Miraglia had not reported the Texas state court suits to a State Farm agent before State Farm was informed of the suits by Gerstel's March 8, 2005, letter. The following pertinent exchanges occurred:[10]

> SC  Did you then, I'm talking about in 2003 have a regular lawyer?
>
> BM  Yes.
>
> SC  Who was that?
>
> BM  Sam Choates.
>
> . . . .

---

[9]Actually, Gerstel's May 8, 2005, letter references both the homeowners policy and the umbrella policy, and the contents of the letter indicate that Gerstel is demanding defense and indemnity for the benefit of Miraglia under both of those policies. State Farm's Resp. to Miraglia's First Mot. for Summ. J., App. Vol. 2 at 435-36.

[10]The "SC" in the transcript is Steve Cotter, representing State Farm. The "BM" is Miraglia. The "BG" is Gerstel, representing Miraglia. State Farm's Resp. to Miraglia's First Mot. for Summ. J., App. Vol. 2 at 395.

SC    And what happened in these four litigations from
      April 2004 until exhibit number one, Mr. Gerstel's
      March 8, 2005 tender?

BM    Virtually nothing because the counsel for the
      plaintiffs enacted a legislative stay. . . .

. . . .

SC    Did you read the suit when they came in?

BM    Yes.

SC    And did you understand that you had been sued for
      alleged defamation?

BM    Yes.

. . . .

SC    Along this tr[ai]l from the time you got served up
      until you you met Mr. Gerstel had anybody mentioned to
      you lawyers, wives, friends, enemies, that you
      might want to look into your insurance coverage
      for these suits?

BM    No.

SC    Did that ever occur to you to do that?

BM    Did I ever occur to ask anybody about it?

SC    Yeah or to take a look at the policy?

BM    You know, no, I mean I thought about it that's why
      I asked Sam Choates you know but he indicated you
      know it wouldn't be covered so I just assumed he
      knew what he was talking about.

SC    Other than that exchange any other time after that
      that renewed the subject, up until the time you
      met Mr. Gerstel and I understand Mr. Gerstel was
            . . .

BM No, not that I recall.

SC Alright, when did you and Mr. Gerstel first meet?

BM Shortly before his first demand.

SC Alright was that specifically in connection with consulting regarding insurance matters or did y[']all meet on the golf course or something totally unrelated?

BM We met on the golf course, unrelated.

SC And how long after that was it that you got with Mr. Gerstel and this letter was sent, number one?

BM I think it was the next day.

State Farm's Resp. to Miraglia's First Mot. for Summ. J., App. Vol. 2 at 411-14.[11] At no time did Gerstel, who was on the line, take issue with any of the statements Miraglia made during the conversation.

Further confirming that the March 8, 2005, letter from Gerstel to State Farm was the first notice Miraglia gave to State Farm of the litigation and claims against him are Miraglia's answers to interrogatories that were served on him in the instant

---

[11]Miraglia has filed objections to State Farm's reliance on the transcript of Miraglia's recorded statement, asserting that the tape recording itself would be the best evidence and that the transcript has not been properly authenticated. The court is satisfied that the transcript is proper summary judgment evidence. It, in effect, was authenticated during Miraglia's deposition. State Farm's Resp. to Miraglia's First Mot. for Summ. J., App. Vol. 1 at 119-24. The court concludes that the transcript is authentic and is what State Farm presents it to be.

action in June 2007.  His answers to interrogatories 8, 9, 10, and 12 (omitting objections) were as follows:

8.

Please identify each and every communication to a person related to any insurance or indemnification for the allegations giving rise to the Underlying Matters or determination of coverage as it relates to the allegations at issue in the Underlying Matters.  For each communication identified, please also state the name, address, and telephone number of each person involved.

Response

.  .  .  .

It has been so long ago, I don't know that I can recall everyone and certainly not numbers and addresses.  I believe I initially called from California and spoke with Jim Joiner (State Farm Agent in Georgia) and his assistant (a gal I don't recall her name) in his office.  He prepared the policy and declaration page and invoice which he sent to me.  I also spoke with him about an Umbrella Policy, and he prepared that for me.  When I first received notice of the underlying lawsuits in May 2004, I immediately contacted my counsel, Sam Choate and engaged Sam Choate to defend me.  Later, I met Brian [sic] Gerstel playing golf and complained of the case, and Brian [sic] said my insurance probably should have covered it.  We met later the same day and reviewed the information and he determined shortly thereafter that he felt it was covered.  He immediately notified State Farm by letter.

.  .  .  .

9.

Please identify each and every communication to the Plaintiff State Farm related to the insurance

policies at issue in this matter and coverage as it relates to the allegations at issue in the Underlying Matters. For each communication identified, pleased [sic] also state the name, address, and telephone number of each person involved.

Response

. . . .

The correspondence from my counsel, Bryan Gerstel, to State Farm and I believe there were 2 statements recorded by State Farm that are not in my possession.

. . . .

10.

Please identify each and every time you sought advice related to the insurance policy at issue in this matter and determination of coverage as it relates to the allegations at issue in the Underlying Matters. For each communication identified, please also state the name, address, and telephone number of each person involved.

Response

. . . .

I met with Brian [sic] Gerstel in early 2005 and immediately thereafter notified State Farm.

. . . .

12.

Please identify each and every date you notified any insurer of any claim or demand for compensation, past, or present from the other Defendants. Set forth each and every contact with each insurer and the dates of all such communications to or from the insurer(s) identified.

Response

. . . .

The date of Bryan Gerstel's first letter to State Farm in early 2005.

State Farm's Resp. to Miraglia's First Mot. for Summ. J., App. Vol. 2 at 427-30.

Interestingly, Miraglia was so meticulous to give a complete answer to interrogatory 8 that he not only told about his discussions with his attorneys concerning the possibility of insurance coverage he also told about his contacts with the State Farm agent relative to acquisition of the two insurance policies. His interrogatory answers make perfectly clear that he had not communicated anything to State Farm about the litigation or claims against him before Gerstel sent State Farm his March 8, 2005, letter. Furthermore, Miraglia provided on July 19, 2007, a declaration for filing with the papers in the instant action in which he declared under penalty of perjury that he had "reviewed the Answers to State Farm's Interrogatories[,] and the answers provided, with the exception of the objections, are true and correct." Id. at 433-34.

Not until Miraglia served in October 2007 amended answers to State Farm's interrogatories 8, 9, 10, and 12 did Miraglia start

taking the positions that he contacted a State Farm agent shortly after he received the suit papers in the Texas state court suits to see if there was coverage for the suits, and that he was told that there was not because the claims were related to his employment. His amended answers that significantly changed his original ones were as follows:

8.

[Text of interrogatory 8 at page 38, supra.]

RESPONSE

Jim Joiner (State Farm broker in Georgia)
Jim Joiner's assistant (I don't recall her name -- worked in Georgia office)
Chris Thomas (State Farm broker who replaced Jim Joiner)
Sam Choate (attorney in GA), 777 Gloucester St, suite 411, Brunswick, GA 31520, 912-264-4211
Bryan Gerstel (attorney in Ca), P.O. Box 2402, Rancho Santa Fe, CA 92067-858-756-4917

I don't recall specific communications. I know I contacted Jim Joiner about the initial homeowners policy. I know we spoke about adding an umbrella policy for further protection a short while later. I know we spoke about some car accidents involving my wife and discontinuing the auto policy. I recall contacting his office when I learned of these suits to see if they were covered and was told because they related to my employment that they were not.

9.

[Text of interrogatory 9 at pages 38-39, supra.]

RESPONSE

Jim Joiner (State Farm broker in Georgia)
Jim Joiner's assistant (I don't recall her name --
worked in Georgia office)
Chris Thomas, (State Farm broker who replaced Jim
Joiner)

I don't recall any specific communications.  I know I
contacted Jim Joiner about the initial homeowners
policy.  I know we spoke about adding an umbrella
policy for further protection a short while later.  I
know we spoke about some car accidents involving my
wife and discontinuing the auto policy.  I recall
contacting his office when I learned of these suits to
see if they were covered and was told that they would
not be covered (I think the reason given was because
the plaintiff's [sic] worked for my former employer so
it was related to my prior employment).  I recall
contacting Thomas to get copies of the homeowners
policy after meeting with Mr. Gerstel.

10.

[Text of interrogatory 10 at page 39, supra.]

RESPONSE

I recall asking Sam Choate (my Georgia counsel).  I
know I contacted Jim Joiner about the initial
homeowners policy.  I recall contacting his office when
I learned of these suits to see if they were covered
and was told that they would not be covered (I think
the reason given was because the plaintiff's [sic]
worked for my former employer so it was related to my
prior employment).

. . . .

12.

[Text of interrogatory 12 at page 39, supra.]

RESPONSE

> I don't recall the exact date, but I believe it would
> have been in late April 2004 or early May 2004 shortly
> after being served with the complaint.

State Farm's Resp. to Miraglia's First Mot. for Summ. J., App.

Vol. 2 at 448-50.[12]

When Miraglia's oral deposition was taken in this action on

January 28, 2008, he elaborated to an extent on the version of

events he had given for the first time in his amended

interrogatory answers. Id., App. Vol. 1 at 37-38, 40-43, 45, 95-

97, 112-13 & 134-38. He could not be certain who he talked to

when he called the State Farm agency. Id. at 135. Nor was he

able to say whether the person who answered the phone was a male

or female. Id. at 136. He did not make any note of the

conversation he said he had with the State Farm agent, nor did he

or his attorney follow up with the State Farm agent to confirm

what he says the agent told him.[13] Id. at 112.

─────────────────────

[12]Miraglia served supplemental answers to State Farm's
interrogatories in April 2008 in which he again gave new and different
answers to interrogatories 8, 9, 10, and 12, that time giving more
elaborate versions of his purported telephone call to a State Farm
agent in May 2004. Miraglia's Resp. to State Farm's Mot. for Leave to
File Second Am. Compl., App. at 102-05.

[13]Affidavits filed by State Farm establish that Miraglia could not
have had a discussion with agent Joiner at the agency during or after
May 2004 because Joiner resigned in January 2003. State Farm's Resp.

(continued...)

After State Farm served its first motion for summary judgment, seeking a declaration of non-coverage because of Miraglia's failure to comply with his "must do" obligations under the umbrella policy, Miraglia again modified his story, this time in a March 4, 2008, affidavit saying:

> 4.    "After being served with the four lawsuits, I immediately called my local Georgia attorney, Sam Choate, to tell him about the lawsuits and to fax him copies of the documentation.  The next day when I called him again to discuss the lawsuits, I asked him if my umbrella liability policy would cover the lawsuits. He told me that he was not an expert in insurance and that I should call my State Farm agent to discuss coverage.  I immediately called my State Farm agency to report the claims and describe the lawsuits, in accord with my prior course of dealing with State Farm.  I believed that I was speaking with Mr. Jim Joiner and perhaps his assistant, Tanya about the claims.  It is possible that when I called to notify State Farm of the lawsuits, I spoke with Mr. Chris Thomas, who I have learned was Mr. Joiner's successor at the State Farm agency which had serviced my insurance business.  There's absolutely no doubt that I had a lengthy telephone conversation with an individual working at the State Farm agency where I had purchased my insurance and where I had reported the two previous claims.  I called the same State Farm agency that I called in the past and followed the same procedure that I had followed in connection with the previous two

---

[13] (...continued)
to Miraglia's First Mot. for Summ. J., App. Vol. 2 at 454-64.  Since his retirement in January 2003, Joiner has had no contact with Miraglia.  Id. at 456.  Those who would have answered the phone at the State Farm agency if Miraglia had called in or after May 2004 denied that they had a conversation of the kind Miraglia said he had with somebody at the agency after he received the suit papers in the Texas state court suits.  Id. at 458-464.

claims.  I gave the details of the lawsuits to an individual working at the State Farm agency, answered the questions about the plaintiffs who sued me, and answered the questions about the claims in the lawsuits.  I told the individual at the State Farm agency the nature of the claims, the identity of the claimants, and the locations of the lawsuits.  The individual at the State Farm agency asked numerous questions which I answered to the best of my ability.  At the end of the telephone conversation, I was informed by the agent that State Farm would not cover the claims under the umbrella policy because the claims were related to my business activities.  I offered to send copies of the lawsuits to the State Farm agency for that individual's review, and I was told by the agent that it was not necessary, since the claims were not covered under the terms of my policies.

    5.  "I then telephoned Mr. Sam Choate again to tell him what my State Farm agent had told me.  Mr. Choate again reminded me that he was not an expert on insurance matters, but if the State Farm agent declined coverage, then I would need to defend the lawsuits.  Mr. Choate agreed to respond to the lawsuits on my behalf.  Because of my prior course of dealing with State Farm, I did not pursue the matter further with State Farm until Mr. Bryan Gerstel intervened on my behalf and again brought the claims to State Farm's attention.  As a result of Mr. Gerstel's request, State Farm assumed the defense of the lawsuits.

Miraglia's First Mot. for Summ. J., App. at 3-5.[14]

    Next came Gerstel's version of events in an affidavit he

signed March 10, 2008.  Miraglia's Resp. to State Farm's Mot. for

---

[14]In an affidavit Miraglia filed in opposition to State Farm's first motion for summary judgment, Miraglia expands even further on his version of events that has him calling a State Farm agent about the Texas state court suits in May 2004.  Miraglia's Resp. to State Farm's First Mot. for Summ. J., App. Vol. 2 at 330-45.

Summ. J., App. Vol. 2 at 396-98. No reasonable finder of fact, after having read Gerstel's March 8, 2005, letter, would believe that Gerstel is being honest in his affidavit. The letter says nothing about Miraglia having informed his insurance company before Gerstel's letter about the Texas state court suits. Yet, Gerstel said in his affidavit that when he first discussed the suits with Miraglia the latter informed him that his insurance company had refused to defend him. Id. at 397. Specifically, Gerstel said in the affidavit that when he and Miraglia first discussed the matter, Miraglia informed him that he had a liability policy, but that it did not cover the defamation claims, and Miraglia added that he knew that it did not cover the claims because he had contacted his insurance agent right after receiving the lawsuits, discussed the details of the lawsuits with the agent, and was told by the agent that because the claims involved business matters they were not covered under the policy. Id. Gerstel said that following those discussions, and after he reviewed the policies, he wrote his March 8, 2005, letter to State Farm requesting defense and indemnity for the claims in the Texas state court suits. Id. at 397-98.

Gerstel provided no explanation in his affidavit as to why his March 8, 2005, letter indicated that it constituted the first

notice of the claims and suits to State Farm or why his letter made no mention of the claim that Miraglia told him that at an earlier date Miraglia had been denied coverage by State Farm after he explained the lawsuits to a State Farm agent or why, under the circumstances, he assured State Farm in his letter that he was not asking State Farm to reimburse Miraglia for expenses Miraglia had incurred before March 8, 2005, in the defense of the Texas state court suits.

Next came the March 21, 2008, affidavit of Choate, which Miraglia presented along with the Gerstel affidavit in support of his opposition to State Farm's first motion for summary judgment. Choate's affidavit directly contradicts what Miraglia told State Farm's representative during the June 9, 2006, telephone conversation, supra at 35-37, and what Miraglia said in his first answers to State Farm's interrogatories, supra at 38-40.[15]

_____

[15]After describing the Texas state court lawsuits, Choate said in his affidavit that:

    4. "Mr. Miraglia caused copies of the aforementioned four lawsuits to be delivered to me. Upon my receipt of the lawsuits, as was my usual practice, I noted the answer dates in the four lawsuits, and advised Mr. Miraglia to contact his insurance company to determine whether or not there was coverage for the claims in the lawsuits. Within a day or two, Mr. Miraglia told me that his insurance company refused
(continued...)

     \*     \*     \*     \*     \*     \*

The foregoing rather tedious development of the discrepancies between the versions of events given by Miraglia and those acting on his behalf concerning when notification was first given to State Farm has had as its goal demonstrating that there is a probability that any rational trier of fact would find from the evidence that the first notification given by or on behalf of Miraglia to State Farm was in the form of Gerstel's May 8, 2005, letter, and that the telephone call to the State Farm sales agent in May 2004 was created to meet the exigencies presented by the assertion by State Farm of a late notice policy defense.

The fact that the summary judgment record contains evidence favorable to Miraglia on the issue of whether he gave notice by telephone to a State Farm agent in May 2004 does not necessarily defeat State Farm's right to a summary adjudication as to that limited fact. In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the Supreme Court said that the standard for granting a

---

[15](...continued)
to provide coverage for the four lawsuits because they arose out of his business.["]

Miraglia's Resp. to State Farm's First Mot. for Summ. J., App. Vol. 2 at 393.

motion for summary judgment "mirrors the standard for a directed verdict," which is that "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id. at 250. Or, as the Fifth Circuit explained in Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969), "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper." The court is satisfied that there is but one reasonable conclusion a fact finder could reach as to the issue of whether Miraglia reported the Texas state court suits to a State Farm agent in May 2004, and that is that he did not do so. Reasonable men could not arrive at a contrary verdict. Therefore, the court resolves that issue against Miraglia as a matter of law.

If State Farm was not notified, and provided copies of suit papers, until it received Gerstel's letter in March 2005, almost a full year would be added to the already lengthy delay of eight months (assumed by the court in the analysis at pages 27-32, supra) after Miraglia acquired knowledge no later than August 2003 that something had happened that might involve the umbrella policy and that claims and suits had been filed against him and

after he had received summons or other process in August 2003 related to those suits. In addition, if the first notification to State Farm was when it received Gerstel's March 2005 letter, there would be additional violations of the policy's "must do" requirements. There was a delay of ten months in the notification by Miraglia to State Farm of the existence of the Texas state court suits, a delay that as a matter of law was untimely.

      d.   <u>Footnote Contentions Made by Miraglia in his Second Motion for Summary Judgment Papers</u>.

In what appears to be a misguided attempt by Miraglia to overcome his failure to give timely notice and make timely delivery of suit papers, Miraglia revisits the late notice issue in footnotes on page 1 of his brief in support of his second motion for summary judgment and on page 2 of his memorandum in support of his response to State Farm's second motion for summary judgment. Miraglia argues that the late notice issue has become moot because the underlying plaintiffs filed second amended pleadings in the Texas state court suits, and he immediately gave notice to State Farm of his receipt of the newly amended pleadings. Needless to say, Miraglia does not cite any authority as support for what appears to be a frivolous contention.

The underlying plaintiffs did, indeed, file second amended original petitions in the Texas state court suits on April 16, 2008, thirteen days after this court issued an order pointing out the court's concerns relative to existence of insurance coverage under the umbrella policy, including a concern that the claims made by the underlying plaintiffs against Miraglia arose from acts engaged in by Miraglia with specific intent to cause harm or injury. An obvious goal of the amended pleadings was to seek to enhance Miraglia's chances of success in persuading the court that his conduct in making the internet postings was something less than intentional. This is borne out by the presentation made by the underlying plaintiffs to the court in opposition to State Farm's second motion for summary judgment.[16] Resp. of Underlying Pls. to State Farm's Second Mot. at 12-13.

Needless to say, once coverage is lost as to certain claims by an insured's failure to comply with the insurance policy's notice conditions, coverage cannot be revived as to those claims by the mere filing by the underlying plaintiff of an amended

---

[16]The attempt by State Farm's opponents in this action to create insurance coverage by artful pleading cannot succeed. See American States, 133 F.3d at 372 (saying, with reference to pleadings filed by the plaintiffs in the underlying state court suits, that "[t]heir artful pleading suggesting that [the insured's] acts were negligent or reckless cannot overcome the basic facts underlying their claims.").

pleading, followed by expeditious delivery thereof to the insurance company. More to the point, delivery by Miraglia to State Farm in April 2008 of amended pleadings in the Texas state court suits could not conceivably cure Miraglia's failure to timely notify State Farm in August 2003 that "something [had] happen[ed] that might involve this policy." Supra at 21.

The court concludes that the delivery to State Farm of the second amended pleadings in the Texas state court suits does not help Miraglia or the underlying plaintiffs on the late notice issue or on any other issue in this action.

     e.   Conclusion Under the Late Notice Issue.

For the reasons given above, the court concludes that State Farm has established by summary judgment evidence as a matter of law that Miraglia failed to comply with his "must do" requirements under the umbrella policy. Regardless of which version of when State Farm was notified is accepted, the umbrella policy's "must do" requirements were not satisfied. Therefore, State Farm is entitled to summary judgment on the ground urged by it in its first motion for summary judgment.

3.    The Other Coverage Issues.

The grounds of State Farm's second motion for summary judgment on the issue of coverage under the umbrella policy are that:

      a.    there is no coverage under the umbrella policy by reason of the policy exclusion that says that State Farm does not provide insurance "for any loss caused by your business pursuits," supra at 20;

      b.    there is no coverage as to the "bodily injury" feature of the policy for the added reason that, if there was bodily injury, it was "either expected or intended by [Miraglia]," supra at 20, thereby coming within the scope of a policy exclusion; and

      c.    there is no coverage under the personal injury feature of the policy for the added reason that the claims against Miraglia are based on internet postings he made with the "specific intent to cause harm or injury," supra at 21, thus bringing the claims against Miraglia within another exclusion from coverage.

For the most part, Miraglia and the underlying plaintiffs take issue with State Farm's grounds.  Miraglia's second motion for summary judgment seeks rulings in his favor on the other

coverage issues. The area where the parties seem to be in agreement is that there is no coverage as to "bodily injury" feature of the umbrella policy.

Inasmuch as the rulings the court is making on the late notice/late-delivery-of-suit-paper issues establish that State Farm has no defense obligation to Miraglia as to the Texas state court suits and has no payment obligation to any of the defendants as to the claims asserted in those suits, the court has concluded that a detailed development of the court's reasoning relative to the remaining coverage issues would not be a wise use of judicial resources. Therefore, the discussion under this heading is brief.

Tentative conclusions on coverage issues were expressed in the order the court signed in the instant action on April 3, 2008. The court persists in those conclusions. One of the conclusions expressed by the court was that the "bodily injury" feature of the umbrella policy does not provide any insurance coverage for the claims and litigation against Miraglia because none of the facts alleged in the Texas state court suits indicate that there is a claim of an "accident," which is essential to any coverage related to the "bodily injury" feature. At page 12 of

Miraglia's brief in support of his second motion for summary judgment and at pages 4-5 of his memorandum in support of his response to State Farm's second motion for summary judgment, Miraglia concedes that the "bodily injury" feature of the policy does not provide coverage. Therefore, the court concludes that this additional reason exists for a ruling that State Farm has no defense or payment obligation based on the bodily injury feature of the umbrella policy.

Quite clearly the claims asserted by the underlying plaintiffs against Miraglia constitute claims of "personal injury" within the meaning of the policy by virtue of being defamation of character claims. <u>Supra</u> at 23. However, equally clear from the summary judgment record is that when Miraglia made the internet postings that are alleged to be defamatory he acted with the specific intent to cause harm or injury to First Cash and its officials. The court recognizes that Miraglia protests that he had such an intent, and that the underlying plaintiffs recently have engaged in artful pleading that undoubtedly had as its goal establishing the possibility that such an intent was lacking. However, the basic facts underlying the claims asserted against Miraglia, establishing his intent to cause harm or injury, cannot be concealed, or wished away, by artful pleadings

or conclusory protestations to the contrary. The court concludes that State Farm has established as a matter of law by the summary judgment record that the "personal injury" feature of the umbrella policy is inapplicable due to the "specific intent to cause harm or injury" exclusion from coverage.

As to the "business pursuits" exclusion, the court is satisfied that business interests of Miraglia led to the making by Miraglia of the internet postings claimed to be defamatory. The business interests he was advancing by making the internet postings would, by any common understanding, be considered to be "a trade, profession or occupation." One of Miraglia's trades, professions, and occupations was the cultivation of the value of his shares of ownership in First Cash--in other words, as an investor. Therefore, the court concludes that State Farm has carried its burden to establish as a matter of law that the "business pursuits" exclusion to coverage under the umbrella policy is applicable.

As discussed under this heading, the court concludes that there are further reasons, in addition to the untimeliness of notice and delivery-of-suit-paper reasons, why State Farm has no defense or indemnification obligations under the umbrella policy.

IV.

Order

For the reasons stated above,

The court ORDERS that the motions for summary judgment of State Farm be, and are hereby, granted, and that the motions for summary judgment of Miraglia be, and are hereby, denied.

The court further ORDERS that State Farm does not have, and has not had, any obligation to provide a defense to Miraglia in the Texas state court suits, and does not, and will not, have any obligation to make any payment to or on behalf of Miraglia as to any liability he might incur to the underlying plaintiffs by reason of the Texas state court suits or the claims or causes of action being asserted against him in those suits.

SIGNED July   2   , 2008.

_____
JOHN McBRYDE
United States District Court